**In re SUPERTRAIL MANUFACTURING CO., INC., Debtor.**

**No. 96–20040–DWH.**

United States Bankruptcy Court, N.D. Mississippi.

June 4, 2010.

Craig M. Geno, Harris Jernigan & Geno, PLLC, Ridgeland, MS, for Debtor.

*OPINION*

DAVID W. HOUSTON, III, Bankruptcy Judge.

On consideration before the court is a Motion to Disburse $1.82 Million of Net Sales Proceeds to Pay the Principal Due on the Superpriority Loan ("Motion to Disburse"), filed by Dr. Mustafa Atac ("Atac"); responses to said motion having been filed by the United States of America–Internal Revenue Service, ("IRS"); the Chapter 11 debtor, Supertrail Manufacturing Co., Inc., ("Supertrail"); Homer

D. Thompson, III, ("Thompson"); and Cal–Bay International, Inc., ("Cal–Bay"); and the court, having considered the evidence presented and the arguments of counsel, hereby finds as follows, to-wit:

## I.

### JURISDICTION

The court has jurisdiction of the subject matter of and the parties to this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is a core contested proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (B), (E), (K), and (O).

## II.

### FACTUAL BACKGROUND

A. The debtor, Supertrail, is a Mississippi corporation that filed a voluntary petition for bankruptcy relief pursuant to Chapter 11 of the United States Bankruptcy Code. Supertrail formerly owned certain real property located in Palm Beach County, Florida, which was ultimately sold to Lennar/Centex at Bayhill, LLC, through proceedings conducted in this court in April, 2006. A part of the sales proceeds remains under the jurisdiction of this court for distribution to creditors of the Supertrail bankruptcy estate, as well as, potentially to other parties in interest.

B. The claims of Atac against the Supertrail bankruptcy estate and, consequently, against the real property sales proceeds originated through the following:

1) Assignment of mortgage from Richard P. Zaretsky, Trustee, to Atac, dated August 7, 1987. This mortgage, which had originally been executed by GAP Estates, Inc., to Zaretsky, as Trustee, is superior in priority to the mortgage executed by GAP Estates, Inc., to Republic Service Corporation, discussed immediately hereinbelow.

2) Assignment of judgment from Kristol Management and Investment, Inc., to Atac, dated August 12, 1994. This judgment is related to a mortgage originally executed by GAP Estates, Inc., to Republic Service Corporation, which assigned the said mortgage to Sandia Federal Savings Association ("Sandia"). Sandia was placed in receivership and the mortgage was acquired by Resolution Trust Company which also obtained the judgment against GAP Estates, Inc., et al. Resolution Trust Company assigned the judgment and mortgage to Kristol Management and Investment, Inc.

3) Pursuant to an Additional and Supplemental Emergency Motion for Authority to Incur Debt and Grant Security Therefor filed by Supertrail, the court entered an order on December 13, 1999, which authorized Atac or his designee to provide financing to Supertrail in the amount of $1,820,000.00. As security for this financing, the order gave Atac or his designee a priming first lien interest over the existing mortgages as to the Phase II property. This particular security interest has been historically referred to as the "superpriority lien." The superpriority lien has been discussed on numerous occasions. Whether it was ever documented beyond the language appearing in the aforesaid order is unknown to this court.

C. Evidenced by an Order on Motion to Aid in Sale of Property, entered December 23, 2002, the parties agreed that Atac would not alienate his mortgage interests since this could possibly impact adversely the proposed sale of the Palm Beach County, Florida, property. This order was to remain effective through January 14, 2003.

Pursuant to a subsequent motion filed by the IRS, a second order, entered February 7, 2003, extended the Order on Motion to Aid in Sale of Property indefinitely. These two orders became known as the anti-alienation or anti-assignment orders.

D. Mrs. Claudia Holliman formerly held claims against Atac by virtue of a Non–Recourse Secured Promissory Note, dated January 14, 2005, and a Non–Recourse Secured Revolving Promissory Note, dated January 14, 2005, both of which were secured by a Security Agreement and Collateral Partial Assignment of Lien, dated August 25, 2005.

E. As determined in prior orders of this court, Holliman did not hold a direct claim against the Supertrail bankruptcy estate.

F. On April 5, 2007, this court entered an order authorizing the distribution of certain of the property sales proceeds that were related to the interest applicable to the Zaretsky mortgage. The order specifically prohibited the distribution of any of the proceeds owed to Atac or his designee related to the superpriority lien which had been authorized pursuant to the order permitting Supertrail to incur the $1,820,000.00 loan from Atac or his designee.

G. On April 25, 2008, the court entered an order setting aside the sum of $2,200,000.00, "with which to pay the claims of Mrs. Holliman, if any, arising out of the assignment" from Atac. The set-aside funds were to be attributable to the proceeds related to the superpriority lien created by the order entered on December 13, 1999. On April 28, 2008, the court entered a separate order regarding Holliman's Request for Issuance of Notice of Transfer of Claim, which stated that, "As Dr. Atac's assignee, Mrs. Holliman is entitled to whatever Dr. Atac would be entitled to recover on the superpriority lien,

subject to the specific terms and provisions of the assignment to Mrs. Holliman."

H. Pursuant to Holliman's Motion for Partial Disbursement, an agreed order was entered on May 30, 2008, releasing to Holliman the sum of $1,006,466.51, representing a portion of the set-aside funds. As set forth in paragraph 32 of this order, the parties specifically reserved several issues for future adjudication.

I. At some point in time, Noreen Griffin Wilson (who is now known as Noreen Griffin, but for purposes of clarity and consistency will be referred to in this Opinion as "Wilson") and Judy Circo ("Circo") were designated as the trustees of the mortgage trust, replacing Atac. From earlier pleadings and orders, the court has been advised that the mortgage trust has apparent authority over the Zaretsky mortgage, the Sandia mortgage, and one or more of the Grieser Trusts. However, exactly what is owned or controlled by the mortgage trust is unknown to this court. Indeed, the precise ownership interest of Atac, individually, in the Zaretsky and Sandia mortgages, as well as, the superpriority lien has never been adjudicated by the court. This is evidenced by the court's comments in an opinion entered on June 6, 2008, to-wit:

> When considering the facts and rendering the decision which resulted in the entry of the Order of April 25th, 2008, this Court was not called upon to construe the legal efficacy of the two promissory notes or the security agreement and collateral partial assignment of lien that were executed by Atac in favor of Holliman. *Precisely how much may be owed to Holliman and what interest Atac legally has in the sales proceeds realized from the Supertrail property must be adjudicated subsequently.* This Court attempted to articulate these factors in its bench comments at the most

recent hearing, as well as, at the conclusion of previous hearings.

The Court has always been of the opinion that Atac individually is *equitably estopped* from asserting the anti-assignment order and its extension as affirmative defenses to preclude Holliman from enforcing her claims, resulting from Atac's execution of the promissory notes and security agreement, exclusively against his interest, whatever it might be, in the property sales proceeds.

J. On June 26, 2008, Holliman filed a lawsuit, styled *Claudia Holliman v. Mustafa Atac, Individually and as Trustee, Judy Circo, Trustee, and Noreen Wilson, Trustee,* No. CIV–08–651–M, in the United States District Court for the Western District of Oklahoma. Specifically, Holliman sought a declaratory judgment determining the amounts due and owing Holliman under the two notes and the security agreement executed by Atac.

K. On June 26, 2008, Atac, Wilson, and Circo, the latter two asserting their claim in their respective capacities as the successor trustees of the mortgage trust, filed their Joint Motion to Disburse Remaining Proceeds of $2.2 Million Set–Aside. They requested that this court: (i) determine in an evidentiary hearing how much that Holliman was entitled to receive from the set-aside, (ii) order that amount be paid to Holliman from the set-aside, and (iii) then to declare that the remaining balance of the set-aside be disbursed to Atac.

L. On July 28, 2008, Holliman filed her Motion to Abandon and Disburse Remainder of $2.2 Million Set–Aside, requesting this court to order the abandonment of the remainder of the set-aside and transfer it into the registry of the United States District Court for the Western District of Oklahoma, to await the final order and judgment in the Oklahoma cause of action.

Pursuant to an order entered October 31, 2008, this court determined that since it had never adjudicated the interest of Atac, or any other party, in the set-aside funds, that the request for abandonment filed by Holliman would be denied, particularly in view of the competing claims of Wilson and Circo as successor trustees, as well as, that of Thompson. The funds were retained under the jurisdiction of this court to await the outcome of the proceedings in the district court. However, this court did abstain so that the district court could determine the rights of the parties under the documents that Atac had executed in favor of Holliman which expressly provided that any disputes arising in connection with those documents would be resolved exclusively in the federal court or the state court located in Oklahoma City, Oklahoma.

M. On August 31, 2009, Supertrail filed its motion to settle and compromise various disputed claims with Holliman and for a corresponding disbursement of cash collateral. Pursuant to this motion, an agreed order was entered by this court on September 22, 2009, which was entered into evidence at the most recent hearing on Atac's Motion to Disburse as Supertrail Exhibit 12. This order, which authorized the disbursement of a part of the superpriority lien proceeds to Holliman in final satisfaction of her claim against Atac, will be discussed further hereinbelow.

N. As reflected on Supertrail Exhibit 15, Wilson, who testified as the Supertrail representative, calculated the respective amounts of the superpriority lien indebtedness and the Zaretsky mortgage indebtedness, as well as, the total of payments that had been made to both Atac and Holliman. Wilson's calculations are set forth as follows:

AMOUNTS DUE/PAID FOR SUPERPRIORITY AND ZARETSKY

SUPERPRIORITY LOAN      Through April 30, 2010      $ 6,521,666
Source: December 13, 1999 Order
[Docket No. 634]

ZARETSKY MORTGAGE      Through 3/1/07      $ 5,070,648
Source: April 5, 2007 Order
[Docket No. 1362]

| | |
|---|---|
| TOTAL OF BOTH: | $11,592,314 |
| LESS TOTAL PAID TO ATAC TO DATE: | ($ 7,800,000) |
| LESS PAYMENTS TO HOLLIMAN: | ($ 2,306,335) |
| REMAINDER: | $ 1,485,979 |
| | |
| CURRENT BALANCE OF CASH: | $ 1,657,398 |

According to these calculations, Wilson suggests that Supertrail has available only $1,485,979, which is applicable to the superpriority lien indebtedness.

To the court's understanding, if Atac were to prevail in his current Motion to Disburse on the theory that the $1,485,979 was exclusively subject to the superpriority lien, Supertrail would be left with only $171,419 in cash. ($1,657,398–$1,485,979) The court is unaware of any other assets that might be owned by Supertrail.

### III.

### DISCUSSION OF IRS CLAIM

The Atac Motion to Disburse is clearly an effort to deplete Supertrail of the balance of its assets which would otherwise be subject to the claims of creditors of the Supertrail bankruptcy estate, notably the claim of the Internal Revenue Service, a claim which has been acknowledged by both Atac and Supertrail on numerous occasions. Consequently, the history underpinning the IRS claim must be carefully considered. The following are relevant events:

A. On June 21, 2007, Atac signed a proposed settlement agreement with the IRS, Supertrail, Wilson, and Circo, the latter two as co-trustees of the mortgage trust. Although this agreement was not executed by the IRS, Supertrail, or the co-trustees, it contained the following provision, to-wit:

1. *Settlement Payment:* The Trust shall pay to the United States Department of the Treasury, Internal Revenue Service, $1,500,000 (the "**Settlement Payment**"), pursuant to the following payment plan and from the following sources: $500,000 from any distribution to Dr. Atac allowed or ordered by the Bankruptcy Court on account of the Super-priority Order; $500,000 from any distribution to the Trust (or Dr. Atac) allowed or ordered by the Bankruptcy Court on account of the Sandia Mortgage; and $500,000 from any distribution to the Trust allowed or ordered by the Bankruptcy Court on account of the Zaretsky Mortgage. All such payments shall be made upon approval of this agreement and at such time as disbursement is made to the Trust and/or Dr. Atac on account of their respective liens.

The proposed agreement did contain other provisions such as the IRS's withdrawal of its objection to the Atac proof of claim, as well as, a release of claim and a covenant not to sue. See, Supertrail Exhibit 7, introduced at the most recent hearing.

B. In an order, entered April 25, 2008, entitled "Order Granting Motion For Or-

der Permitting Disbursement of Cash," the court approved a proposal by Supertrail to reserve $1,500,000 for the claims of the IRS, if any; $2,200,000 for the claims of Mrs. Holliman, if any; and $950,000 for administrative and related claims and expenses, if any. See Supertrail Exhibit 8. The motion which resulted in this order was noticed to Atac and his attorney.

C. A follow-up order, entered May 30, 2008, entitled "Order Granting in Part Claudia Holliman's Motion for Order Disbursing Part of Proceeds from Sale of Florida Property," contained the following language:

> 22. On April 25, 2008 the Court entered its Order Granting Motion For Order Permitting Disbursement Of Cash (Dk. No. 1453) ("Order on Debtor's Disbursement Motion"). *This Order provides that Debtor shall reserve $1.500.000.00 "for the claims of the IRS, if any":* $2,200,000.00 for "the claims of Mrs. Holliman, if any, arising out of the Assignment"; and $950,000.00 "for administrative and related claims and expenses, if any" and that Debtor "shall disburse the remaining funds to Mortgage Trustee Trustees." (emphasis supplied)

As evidenced by the signatures of their respective attorneys, *consent to this particular order was specifically granted by Atac,* Supertrail, Wilson and Circo. See, Supertrail Exhibit 10.

D. As mentioned hereinabove, Supertrail filed a motion on August 31, 2009, entitled "Motion to Settle and Compromise Various Disputed Claims with Holliman and for Corresponding Disbursements of Cash Collateral." This motion, Supertrail Exhibit 13, which was sponsored by Atac and Supertrail, contained the following language:

C. With the addition of the $165,000 from the Texas proceeds, Supertrail will be holding approximately $3.65 million of cash collateral belonging to Atac as trustee. *Pursuant to several orders of this Court, $1.5 million of those funds are being held as a "set aside" for the ultimate determination of the claims, if any, of the IRS. Those funds will continue to be "set aside" for that purpose.* As noted above, $100,000 of those funds will be held for resolution of the receiver's entitlement to receive those funds. $225,000 of those proceeds will be held back to pay the present and future administrative claims of the Estate (after completing the remaining work to be done to conclude the bankruptcy), an amount which Debtor's counsel believes to be sufficient for this purpose. (emphasis supplied)

The aforesaid motion also endorsed and incorporated the proposed settlement between Holliman, Atac, Supertrail, Wilson, Circo, and Thomas S. Waldron, Sr. The following pertinent language appears in this Settlement Agreement, to-wit:

3.4 The following shall occur with respect to the Instruments Of Closing and the cash to be disbursed pursuant to this Agreement in the following order:

> A. The Majorie Firm Ltd. shall file the Agreed Disbursement Motion and Agreed Disbursement Order with the Texas Court, with notice to counsel for the other Parties that they have been filed;

> B. The Majorie Firm Ltd. shall notify Craig Geno ("Geno") in writing (with a copy to Jimmy Goodman) that the Instruments Of Closing have been received (the "Instruments Notice"). Upon receipt of the Instruments Notice and

$165,000.00 from the Texas Registry Funds, Geno will as soon as practicable concurrently do the following in this order:

(1) Disburse $1,310,000.00 of the Cash Collateral to Holliman;

(2) Hold $100,000 of the $165,000.00 for further disbursement to the Receiver or Atac as trustee as determined by the Bankruptcy Court;

(3) *Continue to hold the $1.5 million "IRS Hold–Back" of the Supertrail Cash Collateral for resolution of the IRS Claims pursuant to previous orders of the Bankruptcy Court:* (emphasis supplied)

(4) Hold $225,000.00 of the Supertrail Cash Collateral for payment of administrative claims through the conclusion of the Supertrail bankruptcy case; and

(5) Distribute the balance of the Supertrail Cash Collateral (at least $536,000) to Atac as trustee.

The disbursements in section 3.4(B)(1) and (5) are jointly referred to as the "Cash Collateral Disbursements."

The aforementioned Settlement Agreement was expressly executed by Atac on page 29 on August 25, 2009. See the attachment to Supertrail Exhibit 13.

The agreed order, entered September 22, 2009, mentioned hereinabove, granted the aforementioned motion to settle and compromise, as well as, approved the related Settlement Agreement. The order contained the following language:

C. With the addition of the $65,000 from the Texas proceeds, Supertrail will be holding approximately $3.55 million of cash collateral belonging to Atac as trustee. *Pursuant to several orders of this Court. $1.5 million of those funds are being held as a "set aside" for the ulti-mate determination of the claims, if any, of the IRS. Those funds will continue to be "set aside" for that purpose.* The sum of $225,000 of those proceeds will be held back to pay the present and future administrative claims of the Estate (after completing the remaining work to be done to conclude the bankruptcy), an amount which Debtor's counsel believes to be sufficient for this purpose. (emphasis supplied)

See Supertrail Exhibit 12.

E. On February 23, 2009, the Office of the United States Attorney, Northern District of Mississippi, wrote the attorney of record for Supertrail and advised that the IRS was prepared to go forward with the settlement. The letter further acknowledged that the Office of the United States Attorney had secured a separate settlement letter from the IRS that the $1.5 million settlement amount did include any post-petition federal tax liabilities of Supertrail. This letter was disseminated to Supertrail more than a year prior to the subject Motion to Disburse being filed by Atac. See, the IRS Collective Exhibit 1.

## IV.

### *EQUITABLE AND JUDICIAL ESTOPPEL*

■ Through the aforementioned court orders, particularly the court order approving the motion to compromise the disputed claims with Holliman which incorporated the aforementioned Settlement Agreement, Atac, Supertrail, Wilson, and Circo acknowledged that Supertrail would continue to reserve the $1.5 million "IRS hold back" for the resolution of the IRS claims. The latest agreed order embracing this proposition was entered on September 22, 2009, just over six months prior to Atac filing his Motion to Disburse. The

Motion to Disburse would effectively strip the IRS "hold back" provision from this agreed order which allowed Atac to settle the balance of Holliman's claim against him for the payment of $1.310,000, and additionally authorized him to receive a distribution of $536,000. This court is, consequently, of the opinion that Atac is not only equitably estopped, but is judicially estopped, from attempting to gain possession at this time of the balance of the funds being held by Supertrail, by asserting that these funds are exclusively subject to the superpriority lien which either he or his designee holds.

As pointed out in this court's order, entered October 31, 2008, this is not the first occasion that the court has been required to raise the doctrine of equitable estoppel when considering actions contemplated by Atac. Although set forth hereinabove, one paragraph from the October 31, 2008 order bears repeating, to-wit:

> The court has always been of the opinion that Atac individually is *equitably estopped* from asserting the anti-assignment order and its extension as affirmative defenses to preclude Holliman from enforcing her claims, resulting from Atac's execution of the promissory notes and security agreement exclusively against his interest, whatever it might be, in the property sales proceeds.

Insofar as judicial estoppel is concerned, *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414 (3rd Cir.1988), *cert. denied*, 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988), provides the following overview:

> We are also mindful of the equitable concept of judicial estoppel. This doctrine, distinct from that of equitable estoppel, applies to preclude a party from assuming a position in a legal proceeding inconsistent with one previously asserted. Judicial estoppel looks to the connection between the litigant and the judicial system while equitable estoppel focuses on the relationship between the parties to the prior litigation. *Scarano v. Central Railroad Co.*, 203 F.2d 510 (3rd Cir.1953); *USLIFE Corp. v. U.S. Life Insurance Co.*, 560 F.Supp. 1302 (N.D.Tex.1983).
>
> We conclude that Oneida's failure to list its claim against the bank worked in opposition to preservation of the integrity of the system which the doctrine of judicial estoppel seeks to protect. Although we stop short of finding that, as the bank urges, Oneida's prior silence is equivalent to an acknowledgement that it did not have a claim against the bank, we agree that its current suit speaks to a position clearly contrary to its Chapter 11 treatment of the bank's claim as undisputed.

*Id.* at 419.

The Fifth Circuit expressly recognized the doctrine of judicial estoppel in *Ergo Science, Inc. v. Martin, et al.*, 73 F.3d 595 (5th Cir.1996), as follows:

> Viewed in this light, the issue is more akin to judicial estoppel. The doctrine of judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding. *United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir.1993) *cert. denied*, 511 U.S. 1042, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994). We recognize the applicability of this doctrine in this circuit because of its laudable policy goals. The doctrine prevents internal inconsistency, precludes litigants from "playing fast and loose" with the courts, and prohibits parties from deliberately changing positions based upon the exigencies of the moment.

73 F.3d at 598.

In the *Matter of Coastal Plains, Inc.*, 179 F.3d 197 (5th Cir.1999), Judge Rhesa

Barksdale, writing for the court, provided the following comments:

> Judicial estoppel is "a common law doctrine by which a party who has assumed one position in his pleadings may be estopped from assuming an inconsistent position". *Brandon v. Interfirst Corp.,* 858 F.2d 266, 268 (5th Cir.1988).[FN1] The purpose of the doctrine is "to protect the integrity of the judicial process", by "prevent[ing] parties from playing fast and loose with the courts to suit the exigencies of self interest". *Id.* (internal quotations marks, parentheses, and citation omitted). [FN2] Because the doctrine is intended to protect the judicial system, *rather than the litigants,* detrimental reliance by the opponent of the party against whom the doctrine is applied is not necessary. *See Matter of Cassidy,* 892 F.2d 637, 641 & n. 2 (7th Cir.), *cert. denied,* 498 U.S. 812, 111 S.Ct. 48, 112 L.Ed.2d 24 (1990).[FN3]

179 F.3d at 205.

> It goes without saying that the Bankruptcy Code and Rules impose upon bankruptcy debtors an express, affirmative duty to disclose all assets, *including contingent and unliquidated claims.* 11 U.S.C. § 521(1) ("The debtor shall—(1) file a list of creditors, and unless the court orders otherwise, a schedule of assets and liabilities, a schedule of current income and current expenditures, and a statement of the debtor's financial affairs"). "The duty of disclosure in a bankruptcy proceeding is a continuing one, and a debtor is required to disclose all potential causes of action". *Youngblood Group v. Lufkin Fed. Sav. & Loan Ass'n,* 932 F.Supp. 859, 867 (E.D.Tex. 1996). " 'The debtor need not know all the facts or even the legal basis for the cause of action; rather, if the debtor has enough information . . . prior to confir-

mation to suggest that it may have a possible cause of action, then that is a "known" cause of action such that it must be disclosed' ". *Id.* (brackets omitted; quoting *Union Carbide Corp. v. Viskase Corp. (In re Envirodyne Indus., Inc.),* 183 B.R. 812, 821 n. 17 (Bankr. N.D.Ill.1995)). *"Any claim with potential must be disclosed,* even if it is 'contingent, dependent, or conditional' ". *Id.* (quoting *Westland Oil Dev. Corp. v. MCorp Management Solutions, Inc.,* 157 B.R. 100, 103 (S.D.Tex.1993)) (emphasis added).

*Id.* at 207–08.

> Our review of the jurisprudence convinces us that, in considering judicial estoppel *for bankruptcy cases,* the debtor's failure to satisfy its statutory disclosure duty is "inadvertent" only when, in general, the debtor either lacks knowledge of the undisclosed claims *or* has no motive for their concealment. [FN9]

*Id.* at 210.

> Coastal's claimed "inadvertence" is not the type that precludes judicial estoppel against plaintiffs, as Coastal's successors, from asserting in the instant litigation the previously nondisclosed claims; Coastal both knew of the facts giving rise to its inconsistent positions, *and* had a motive to conceal the claims.

*Id.* at 212.

■ In a more recent opinion discussing judicial estoppel, *In the Matter of: Superior Crewboats, Inc.,* 374 F.3d 330 (5th Cir. 2004), Judge Edith Jones indicated that the Fifth Circuit recognized three requirements which were applicable to the theory of judicial estoppel: (1) The party is judicially estopped only if its position is clearly inconsistent with the previous one; (2) the court must have accepted the previous position; and (3) the non-disclosure must not have been inadvertent. 374 F.3d at 335.

**390**

In his effort to "sweep" practically all of the available funds in the Supertrail bankruptcy estate through his Motion to Disburse, Atac is asserting the perceived priority of his claim in a manner that is inconsistent with the Settlement Agreement that he executed and ratified in the aforementioned motion to settle and compromise the disputed claims with Holliman. (Supertrail Exhibit 13) This motion and Settlement Agreement were approved by the court in its September 22, 2009 order, (Supertrail Exhibit 12), which was consistent with at least two other orders entered by this court. Atac's Motion to Disburse is also inconsistent with the Settlement Agreement that he executed on June 21, 2007. The court and the IRS obviously accepted the representation that a $1.5 million "hold-back" was being reserved as evidenced by the aforementioned orders, as well as, the letter to Supertrail's counsel from the Office of the United States Attorney, Northern District of Mississippi. Finally, there is absolutely no indication whatsoever that any of this previous inconsistent conduct was inadvertent. Consequently, the three elements necessary to establish judicial estoppel as articulated by the Fifth Circuit Court of Appeals are clearly present

Based on the above and foregoing, the court is of the opinion that the Atac Motion to Disburse is not well taken in that Atac is judicially estopped from attempting to assert his perceived superpriority lien to prematurely capture the majority of funds available in the Supertrail bankruptcy estate. This motion is contrary and inconsistent with the previous orders of this court approving a $1.5 million "hold-back" as a possible source of payment of the IRS claim, if any. The court hastens to add that this decision does not adjudicate the validity of the IRS claim in any amount, but simply orders that $1.5 million be retained as a possible source of payment

should a claim in favor of the IRS be ultimately allowed. Supertrail and its counsel are directed to withhold this money accordingly.

A separate order will be entered consistent with this opinion.